IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERRY LEE SPONSLER, | ) | CASE NO. 1:17-CV-822 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Terry Lee Sponsler ("Sponsler") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 13.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Sponsler protectively filed an application for DIB on October 9, 2013, alleging a

disability onset date of September 8, 2012.  Tr. 21, 171.  He alleged disability based on the

following: diabetes, right knee fracture, and chronic pain in both feet.  Tr. 174.  After denials by

the state agency initially (Tr. 77) and on reconsideration (Tr. 87), Sponsler requested an

administrative hearing.  Tr. 114.  A hearing was held before Administrative Law Judge ("ALJ")

Melissa Warner on March 1, 2016.  Tr. 33-66.  In her April 14, 2016, decision (Tr. 21-28), the

ALJ determined that Sponsler did not have an impairment or combination of impairments that

significantly limited his ability to perform basic work-related activities for 12 consecutive

months, i.e. he is not disabled.  Tr. 24.  Sponsler requested review of the ALJ's decision by the Appeals Council (Tr. 14) and, on February 16, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Sponsler was born in 1957 and was 56 years old on the date his application was filed.  Tr. 171.  He finished high school and attended two years of classes at a career center.  Tr. 175.  He previously worked full time as a janitor and a groundskeeper.  Tr. 48-49.

### B. Relevant Medical Evidence

Evidence prior to the relevant period: On July 18, 2002, Sponsler injured his right knee at work.  Tr. 228.  X-rays showed a fractured lateral tibial plateau and rupture of the suprapatellar quadriceps mechanism in his right knee.  Tr. 228.  W. S. Brechbuhler, M.D., recommended arthroscopic surgery, which he performed on July 23.  Tr. 230.  Dr. Brechbuhler remarked that it was not a typical suprapatellar rupture. Tr. 231.

In January 2008 Sponsler established care with Julie Jones, M.D., a family practitioner. Tr. 336.  He saw Dr. Jones that day because he was sick with a cough and nasal congestion.  Tr. 336.  He reported a history of hypothyroidism and diabetes and stated that his glucose levels had been normal.  Tr. 326.  He weighed 360 pounds.  Tr. 337.  He was treated for the flu.  Tr. 338.

In February 2008 Sponsler returned to Dr. Jones for a follow-up visit for lab work.  Tr. 333.  He admitted to not eating right and only sleeping four hours a night because his girlfriend would wake him up when she came home from work to watch television with her.  Tr. 333.  He was working the second shift.  Tr. 333.  Dr. Jones discussed with Sponsler that adequate sleep

was critical in weight loss and recommended eating only when hungry and stopping when full. Tr. 335. He was aware of the risks of long-term obesity. Tr. 335.

On June 6, 2008, Sponsler saw podiatrist Adrian King, DPM, with a blister on his right foot from being "really active" while wearing his work boots instead of his walking shoes. Tr. 235. Dr. King put a bandage on it and advised Sponsler to wear his walking shoes. Tr. 235. On June 13, his blister was "doing great" and he had "no problems whatsoever." Tr. 235.

On June 24, 2008, Sponsler told Dr. Jones that he was unemployed and ate out of boredom. Tr. 330. He had a YMCA membership but did not use it regularly. Tr. 330. He was not compliant with recommended diet or exercise. Tr. 330. Dr. Jones had a lengthy discussion with Sponsler about making lifestyle changes. Tr. 332.

On July 28, 2008, Sponsler established care with endocrinologist Angela Novy, M.D. Tr. 284. He reported having been diagnosed with diabetes mellitus at age 30. Tr. 284. He reported joint pain in his knees, weakness, being easily fatigued and having body aches. Tr. 284. Upon examination, he was obese and had no extremity thinning, no edema, no lesions, and no calluses. Tr. 285. He had normal strength in his upper and lower extremities and a normal gait. Tr. 285.

On September 1, 2009, Sponsler saw Dr. King with a splinter in his big toe he got while staining his deck. Tr. 235.

On November 16, 2011, Sponsler saw Dr. Novy. Tr. 271. He had impaired vision, wore glasses, and was overdue for an eye appointment.[1] Tr. 271.

---

[1] Both parties block cite to numerous transcript pages in support of evidence purportedly found in Dr. Novy's notes. See, e.g., Doc. 14, p. 4; Doc. 15, p. 3. Dr. Novy's notes are handwritten and not easily translated. The Court recites the evidence in these notes when the parties cite to one specific page of the transcript and the Court is able to discern Dr. Novy's words and/or symbols and their meaning.

A treatment note from Dr. Novy on June 5, 2012, shows that she had prescribed four insulin injections per day at certain times for Sponsler.  Tr. 267.  Sponsler complained of occasional body aches.  Tr. 267.  Rarely his hypoglycemia caused symptoms such as shakiness and "feel[ing] funny."  Tr. 267.  He had recently lost 14 pounds and weighed 367.2 pounds.  Tr. 267.

On June 5, 2012, Sponsler reported a history of ulcers on his feet to Dr. Novy and stated that he sees Dr. King for his feet.  Tr. 268.

On August 28, 2012, Sponsler saw Dr. Jones for a follow-up for his hypothyroidism.  Tr. 305.  He had run out of his medication about three or four months prior but he had been feeling well with no problems or concerns other than feeling "a little tired."  Tr. 305.

Evidence during the relevant period (September 8, 2012-March 31, 2013): On September 11, 2012, Sponsler saw Dr. Novy for a follow-up visit.  Tr. 265.  He reported that he was "still out of work."  Tr. 265.  He reported body aches and having gained one pound.  Tr. 265.  He walked 30 minutes twice a week.  Tr. 265.  He reported that rarely he had hypoglycemia symptoms of sweats and shakes.  Tr. 265.  He had no neuropathy symptoms, excellent blood pressure, and no foot ulcers.  Tr. 266.  Dr. Novy suggested lifestyle changes.  Tr. 266.

On December 14, 2012, Sponsler told Dr. Novy that he walked 30 minutes three times a week.  Tr. 263.  He complained of body aches and he had gained .3 pounds.  Tr. 263.  He reported that rarely he had hypoglycemia symptoms of sweats and shakes.  Tr. 263.  He had no neuropathy or foot ulcers.  Tr. 264.

On March 14, 2013, Sponsler told Dr. Novy that he was doing well.  Tr. 261.  He reported no routine exercise and having hypoglycemia symptoms once a month of fatigue and sweats.  Tr. 261.  He had lost .3 pounds.  Tr. 261.  He had occasional cramping bilaterally in his

hamstrings.  Tr. 261.  He had no neuropathy, excellent blood pressure, and no foot ulcers.  Tr. 262.  His cholesterol was "just a little high, but acceptable."  Tr. 262.

Evidence after the relevant period: On June 3, 2013, Sponsler informed Dr. Novy that he was doing well overall.  Tr. 258.  He reported occasional hypoglycemia symptoms of shakes and sweats.  Tr. 258.  He sometimes had joint pain in his knees and muscle cramps in his thighs.  Tr. 259.  He had no neuropathy.  Tr. 259.

On August 29, 2013, Sponsler saw Dr. Jones for his annual checkup.[2]  Tr. 301.  He had no problems or concerns.  Tr. 301.  Upon exam, he had a normal gait.  Tr. 303.

On September 6, 2013, Sponsler told Dr. Novy that he walked two miles three times per week.  Tr. 255.  He reported hypoglycemia symptoms of shakes and sweats three times every two weeks.  Tr. 255.  He had gained three pounds.  Tr. 255.  He had no neuropathy, good blood pressure, and no foot ulcers.  Tr. 256.  He denied any muscle cramps or joint pain.  Tr. 256.

On November 22, 2013, Sponsler returned to podiatrist Dr. King after not having seen him since 2009.  Tr. 237.  The reasons for his visit was a yearly foot check and he complained of diabetic neuropathy, i.e, pins and needles in his feet and ankles that he felt all the time.  Tr. 237.  Dr. King described him as morbidly obese.  Tr. 237.  Upon exam, Sponsler had no ulcers or other skin abnormalities.  Tr. 238.  He had diminished sensation bilaterally in his lower extremities.  Tr. 239.  He had a normal range of motion, normal strength, no swelling, and a normal gait.  Tr. 239.  Dr. King reviewed X-rays showing degenerative joint disease in the third MPJ joint in Sponsler's right foot and metatarsus adductus bilaterally, all "progressing as expected."  Tr. 239.  Dr. King recommended topical therapy and diabetic shoes and explained

---

[2] In his brief, Sponsler refers to and cites to records of Dr. Jones (Doc. 14, p. 4).  He claims that Dr. Jones was prescribing his diabetes and hypothyroid medications but the record he cites is a treatment note from Sponsler's podiatrist, Dr. King, listing Sponsler's medications.  See Tr. 238.  It appears that Dr. Novy was prescribing Sponsler's diabetes medication.  See Doc. 267, 297.

that good diabetic foot care included checking feet every day, lotion for dry skin especially in winter, and good blood sugar control. Tr. 239. He wrote, "weight loss is a must," that Sponsler must get serious about weight loss "NOW," and that obesity is adversely affecting his feet. Tr. 239. He stated, "[patient] advised feet not bad enough for disability, esp with no recent ulcers." Tr. 239.

On May 15, 2014, Sponsler saw Dr. King again and reported that he was doing great and that he needed to work on his weight. Tr. 289. He had no sores on his feet and they were very dry. Tr. 289. Dr. King remarked that he would see Sponsler in another six months for a checkup unless a problem arose. Tr. 289.

On November 7, 2014, Sponsler returned to Dr. King again and stated that he was doing great. Tr. 290. He reported that he had quit chewing tobacco about a year and a half ago, something that "is one of the biggest things that has helped." Tr. 290. Dr. King described Sponsler as a morbidly obese diabetic. Tr. 290. He recommended that Sponsler keep working on his weight and the dry skin on his feet, which was "very, very dry." Tr. 290. His glucose level was "appropriate." Tr. 290.

On March 24, 2015, Sponsler saw Dr. King, "still doing really well except for he is still overweight." Tr. 291. He had lost 12 pounds. Tr. 291. That day, his sugar was running high "because he just over did it at a Chinese restaurant." Tr. 291. Upon examination, Sponsler had no open wounds or ulcers, just very dry skin. Tr. 291. Dr. King advised Sponsler to use Crisco, olive oil, Vaseline; "anything to get some moisture and oil in that skin." Tr. 291.

On October 9, 2015, Sponsler saw Dr. Jones for a follow-up visit. Tr. 293. His blood pressure was good and he reported seeing Dr. Novy the day before and that there was no change

in his diabetes and hypothyroid medications.  Tr. 293.  Upon exam, he weighed 370.3 pounds.

Tr. 295.  He was advised to continue care and follow up annually or as needed.  Tr. 296.

### C. Medical Opinion Evidence

#### 1. Consultative examiner

On December 18, 2013, Sponsler attended a consultative examination with Sean Keyes,

D.O.  Tr. 241-242.  Sponsler reported pain in his low back, hips and knees.  Tr. 241.  His back

pain started about 10 years prior, has gotten worse over time, and, in Sponsler's opinion, is likely

due to a long history or manual labor and poor lifting technique.  Tr. 241.  He denied numbness,

tingling and gait problems.  Tr. 241.  He had not had any treatment for his pain other than taking

over-the-counter anti-inflammatories.  Tr. 241.  His hips hurt after prolonged standing and he

had not sought treatment for this.  Tr. 241.  He had bilateral knee pain also after prolonged

standing and reported chronic pain in his right knee since his surgery.  Tr. 241.  He advised that

he stopped working as a farmer in 2011 due to a disagreement with the owner and that he might

be able to return to this work but did not feel that he could keep up with the pace of farming or

factory work.  Tr. 241.  He could drive a car, sit for up to an hour, lift 40 pounds, and he could

cook, clean, bathe, dress, and perform fine motor activities without difficulty.  Tr. 241.  Upon

examination, Sponsler rested comfortably in the chair and could remove his shoes with his feet.

Tr. 242.  Upon manual muscle testing he showed 5/5 muscle strength with no spasm or atrophy,

full range of motion in all areas and intact sensation.  Tr. 242-246.  He reported pain with

palpation of the sciatic notch from his buttocks to his knees.  Tr. 242.  He had grinding with

range of motion in his right knee and intact knee ligaments.  Tr. 242.  He had a normal gait,

could stand and ambulate around the room without difficulty, and had no difficulty with toe and

heel rises.  Tr. 242.  X-rays of the knees showed degenerative joint disease with medial joint

space narrowing, sclerosis, and osteophyte formation in his right knee. Tr. 242. Dr. Keyes assessed low back pain, hip pain, and knee pain. Tr. 242. He opined that Sponsler "would qualify for medium work in an occupation that would allow him to work at an appropriate speed for his skill level and to adjust as needed for comfort." Tr. 242.

### 2. State agency reviewing physicians

On January 14, 2014, state agency reviewing physician Edmond Gardner, M.D., reviewed Sponsler's record. Tr. 74. He found that Sponsler had the following severe impairments: obesity, diabetes mellitus, and major joint dysfunction. Tr. 71. He opined that Sponsler could perform medium work with postural limitations. Tr. 72-73. On April 11, 2014, Steve E. McKee, M.D., a state agency medical consultant, reviewed Sponsler's record and agreed with Dr. Gardner's assessment. Tr. 82-84.

### D. Sponsler's Testimony

Sponsler was represented by counsel and testified at the administrative hearing. Tr. 35-64. At the time of the hearing he weighed 375 pounds, which is what he has weighed for about four years, give or take 10 or 15 pounds. Tr. 39. In 2012 and 2013, during the relevant time period for disability, Sponsler was living with his father, who supported him. Tr. 41. He also did odd jobs for people, such as mowing yards in the summer. Tr. 41. He uses a push mower and the biggest yard he has done was "195 deep by 125 wide." Tr. 41.

The ALJ discussed with Sponsler his past relevant work performing janitorial maintenance, which consisted of changing floor tiles, stripping and waxing floors, and putting new floors in. Tr. 42. He would also repair equipment. Tr. 43. He then worked full time through a temp agency rebuilding auto part racks and working a maintenance job. Tr. 44. Up to the time shortly before his alleged onset date he worked as a groundskeeper on a 192-acre private

farm. Tr. 49. He mowed grass, trimmed banks, and split wood. Tr. 49. He used both riding mowers and push mowers and spent most of his time using the push mowers. Tr. 50. The owner of the farm was his then-girlfriend's father; she and her father had a falling out, and, as a result, he lost his job. Tr. 50. If they had not had a falling out, "I'd probably still be working there." Tr. 51.

Sponsler's attorney, after conferring privately with Sponsler, questioned him about his physical issues that would have prevented him from doing his prior groundskeeper job during the relevant period. Tr. 52-53. Sponsler confirmed that he had "some issues with [his] back," such as pain, and agreed that back pain prevented him from doing certain activities such as walking. Tr. 53. Sponsler explained that when he walked "any prolonged length of time" his hips and his back would start hurting and he would have to stop and take a break. Tr. 53. When asked whether he took breaks when performing the odd jobs he had been doing mowing people's yards, he stated that he took breaks every 15 or 20 minutes and that the breaks lasted for about 15 minutes. Tr. 54. Sometimes taking a break stopped his back from hurting but sometimes it did not. Tr. 54. When asked if his back pain had ever been so severe that he had to stop pushing the lawnmower, Sponsler stated that it had and that he had to call for help. Tr. 54.

When asked about his diabetes symptoms, Sponsler explained that when his sugar would go down he would get dizzy and faint. Tr. 54. He took four injections per day at specific times of the day that his doctor had set up for him. Tr. 55. He has neuropathies in his feet; he did not have this in September 2012 but he did have it prior to March 2013. Tr. 55-56. It felt like he had pins and needles in his feet, his feet would hurt and throb, and they would feel better if he got off his feet and rubbed them a little bit. Tr. 56. He would get neuropathies in his feet with prolonged standing and walking; "If I was standing in one spot, it would – it would start within

an hour, or two, after I was at work." Tr. 56. He had to wait until break time to get off his feet. Tr. 56.

When asked about his issues with his right knee, Sponsler stated, "I broke it." Tr. 56. He had surgery. Tr. 56. He agreed with his attorney that he had issues with his knee in September 2012; his issues prevented him from standing for a prolonged period of time. Tr. 57. "Standing in one spot, just it's bad....If I can move around a little bit, it's not so bad." Tr. 57. He agreed that "back then" he had issues with kneeling; "when you have an issue with your knees, and so forth, and you just can't kneel, unless you got kneepads on." Tr. 57. Crawling would have been an issue in 2012 because of pain. Tr. 57. He "sometimes" had issues walking up stairs because of his knees. Tr. 57-58. He would have to take a five minute break when going up a flight of stairs. Tr. 58. When he drives on long trips (about 700 miles) he has to stop every half hour or hour to get out and stretch. Tr. 58. He had issues lifting a heavy amount of weight due to his knees and he could lift 40 pounds repetitively. Tr. 59. He also stated that he could not lift 40 pounds and modified his answer to lifting 20 pounds. Tr. 60. He also has "sleeping issues" and can't sleep on his back due to pain. Tr. 60. During 2012 he had woken up with pain during the night and that caused fatigue the next day. Tr. 60-61.

The ALJ asked Sponsler about his statement to his endocrinologist in September 2013 wherein he stated that he exercised by walking a couple of miles three times a week. Tr. 61. Sponsler agreed and added, "I try to walk three miles a day. That's what she suggested, but I don't always walk three miles a day." Tr. 61. The ALJ asked, "How many times do you think you actually do that?" and Sponsler answered, "None." Tr. 61. The ALJ again asked Sponsler how long he could have remained working at his groundskeeper job had he not been let go due to his then-girlfriend and her father falling out with each other and Sponsler stated that he would

have stopped doing the work anyway "because ... he was becoming a pain." Tr. 63. He also said

that he had been planning on quitting because his hips and his back, "everything, was really

starting to bother me." Tr. 63. He was the only groundskeeper there and it was too much for one

person. Tr. 63. The ALJ asked him why he left his janitor job and Sponsler stated that he had

been fired for sexual discrimination. Tr. 64. She asked him if there was a point in time when he

would have been physically unable to do that job and Sponsler replied, "It would have been

when I filed for disability. Because there—there again, I was the only person that did my job. I

had no help, and that stuff was getting me old, getting heavy." Tr. 64.

The ALJ next discussed with Vocational Expert Mary Everts ("VE") Sponsler's past

relevant work and had no other questions for the VE. Tr. 64-65.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations. The five steps can be

summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her April 14, 2016, decision, the ALJ made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2013. Tr. 23.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 8, 2012 through his date last insured of March 31, 2013. Tr. 23.

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3. Through the date last insured, the claimant had the following medically determinable impairments of diabetes mellitus, hypothyroidism, hypertension, and obesity. Tr. 24.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities or combination of impairments. Tr. 24.

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 8, 2012, the alleged onset date, through March 31, 2013, the date last insured. Tr. 28.

## V. Plaintiff's Arguments

Sponsler argues that the ALJ's Step Two finding that he has no severe impairments is not supported by substantial evidence; the ALJ failed to consider the effects of his obesity at each step of her evaluation; and that the ALJ erred when giving little weight to the state agency reviewing physicians' opinions. Doc. 14, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

**A. The ALJ's Step Two finding is supported by substantial evidence**

At Step Two, a claimant must show that he suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience). *Long v. Apfel*, 1 Fed. App'x 326, 331-332 (6th Cir. 2001); 20 C.F.R § 404.1521(c). Basic work activities are defined by the regulations as "'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. App'x 181, 190 (6th Cir. 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

In *Higgs v. Bowen*, the Sixth Circuit found that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." 880 F.2d 860, 862 (6th Cir. 1988). The *Higgs* court observed that "this lenient interpretation of the severity requirement in part represents the courts' response to the Secretary's questionable practice in the early 1980s of using the step two regulation to deny meritorious claims without proper vocational analysis." *Id*. But the court also recognized that "Congress has approved the threshold dismissal of claims obviously lacking medical merit . . . ." *Id*. That is, "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 863. The *Higgs* court approved of that practice and affirmed dismissal because the record contained no objective medical evidence to support the plaintiff's claims of severe impairment. Particularly

relevant to the case at bar, the *Higgs* court observed that "[t]he mere diagnosis of [an ailment], of course, says nothing about the severity of the condition." *Id.*

Since *Higgs*, the Sixth Circuit has regularly found substantial evidence to support a finding of no severe impairment if the medical evidence contains no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition. *See, e.g., Long*, 1 Fed. App'x. at 332; *compare Maloney v. Apfel*, 211 F.3d 1269 (table), No. 99-3081, 2000 WL 420700 at *2, (6th Cir. 2000) (per curiam) (finding substantial evidence to support denial when record indicated claimant showed symptoms and was diagnosed with disorder but did not contain evidence of a disabling impairment that would prevent work); and *Foster v. Secretary of Health & Human Svcs.*, 899 F.2d 1221 (table), No. 88-1644, 1990 WL 41835 at *2 (6th Cir. 1990) (per curiam) (finding substantial evidence to support denial when the claimant produced no evidence regarding the frequency, intensity, and duration of arthritic pain; the record indicated that he was no more than slightly or minimally impaired); *with Burton v. Apfel*, 208 F.3d 212 (table), No. 98-4198. 2000 WL 125853 at *3 (6th Cir. 2000) (reversing finding of no severe impairment because record contained diagnoses and remarks from a number of treating physicians and psychologists to the effect that claimant was "'unable to work ... due to the complexity of her health problems'" (quoting physician)); *and Childrey v. Chater*, 91 F.3d143 (table), No. 95-1353, 1996 WL 420265 at *2 (6th Cir. 1996) (per curiam) (reversing finding of no severe impairment because record contained an assessment by a consulting physician reflecting a variety of mental problems that left her "'not yet able to really care for herself alone,'" reports of two other physicians corroborating this, consistent testimony from the claimant, and no medical evidence to the contrary (quoting physician)).

The record in this case does not contain a single statement by a treating physician indicating that Sponsler's health problems result in any specific work-impairing limitations. *See Long*, 1 Fed. App'x at 332.

### 1. Diabetes

Sponsler argues that the ALJ erred because she improperly relied "on her own finding" that Sponsler walked 30 minutes a day, 2 to 3 times per week "without looking at the medical record." Doc. 14, p. 8. But it was within the medical record that Sponsler had reported walking 30 minutes a day, 2 to 3 times per week, as the ALJ observed. Tr. 27 (citing Dr. Novy's treatment notes, Tr. 263-265). Sponsler also complains that the ALJ "misconstrues" Dr. Novy's treatment notes "and cites only sporadic complaints." Doc. 14, p. 8. The Court disagrees. The ALJ accurately cited Dr. Novy's treatment notes from June 5, 2012, to September 6, 2013 (Tr. 27), wherein Sponsler did not complain of any issues (Tr. 257), complained of occasional body aches (Tr. 261, 267), reported no body aches but muscle cramps in his thighs and joint pain in his knees, both occurring "sometimes" (Tr. 259), and complained of body aches (Tr. 263, 265). Contrary to Sponsler's assertion that Dr. Novy "opined" that Sponsler had "issues" with joint pain and body aches (Doc. 14, p. 8, citing the same transcript pages), Dr. Novy did not "opine" these things; the occasional body aches, muscle cramps and joint pain Sponsler reported were his subjective complaints. Objectively, Dr. Novy found that Sponsler did not have neuropathy, did not have ulcers on his feet, and had "excellent" blood pressure. See, e.g., Tr. 258, 264, 266, 262. Although Sponsler states that Dr. Novy wrote that he had a history of ulcers on his feet (Doc. 14, p. 8) he did not actually have ulcers on his feet when he saw Dr. Novy. Nor is there a treatment note from Sponsler's podiatrist, Dr. King, observing that he had ulcers on his feet. Dr. King only told Sponsler to make sure to check his feet for ulcers. Moreover, the ALJ observed that

Sponsler did not see Dr. King for four years, from September 2009 to November 2013 (after the relevant period). Tr. 26. In short, the ALJ did not "cherry-pick" the record when she observed that Sponsler himself reported occasional body aches and muscle cramps and there was no evidence of foot ulcers. The above-cited records do not "clearly demonstrate more than a minimal impact on [Sponsler's] ability to work," as Sponsler claims (Doc. 14, p. 9).

2. Knee impairment

Sponsler contends that the ALJ "erred in rejecting [his] knee conditions as severe impairments" because the ALJ's conclusion that Sponsler's knee condition was "fully resolved" is not supported by the record. Doc. 14, p. 9. The ALJ remarked that Sponsler's knee fracture and surgery occurred in July 2002, ten years before the alleged onset date. Tr. 25. She accurately observed that, thereafter, Sponsler returned to his work as a janitor, which "strongly suggests" that his knee impairment would not have prevented him from working during the relevant period. Tr. 25. She also detailed his work history as a groundskeeper for his girlfriend's father up to the alleged onset date, a job which required him to care for 14 acres by mowing with a push mower, trimming and tending to outbuildings. Tr. 25. The ALJ commented that Sponsler had stated at his hearing that he would still be performing the groundskeeper job if his girlfriend had not had a falling out with the owner of the land, her father. Tr. 25. In other words, there was no evidence that Sponsler's knee impairment resulted in any specific work-impairing limitations. *See Long*, 1 Fed. App'x at 332.

Sponsler states that, nine months after the relevant period, he saw consultative examiner Dr. Keyes, who "diagnosed" him with "degenerative joint disease and medical joint space narrowing of the right knee and sclerosis and osteophyte formation." Doc. 14, p. 9. First, this is inaccurate; Dr. Keyes recited Sponsler's x-ray results as showing "degenerative joint disease..."

etc.; Dr. Keyes did not diagnose Sponsler with degenerative joint disease.  Dr. Keyes diagnosed

Sponsler with "1) Low back pain, 2) Hip pain, 3) Knee pain."  Tr. 242.  Second, although

Sponsler states that the ALJ's conclusion was at odds with his x-ray results, Dr. Keyes' findings,

"and traditional medical knowledge" Doc. 14, p. 10, the Court disagrees.  Dr. Keyes' findings

were minimal, as the ALJ observed.  See Tr. 26-27 (ALJ commenting that Dr. Keyes observed

that Sponsler could stand and ambulate around the room without difficulty, had full muscle

strength, intact sensation, and a normal range of motion).  Notwithstanding what Sponsler refers

to as "traditional medical knowledge," an x-ray finding of degenerative joint disease with

minimal physical exam findings and a diagnosis of knee pain does not mean that Sponsler's knee

impairment was severe.  *See Higgs*, 880 F.2d at 864 ("The mere diagnosis of arthritis, of course,

says nothing about the severity of the condition.").

        3. Obesity

Sponsler argues that the ALJ improperly determined that his obesity was not a severe

impairment and failed to assess the symptoms of obesity in conjunction with his other

impairments.  Doc. 14, p. 10.  He argues that the ALJ rejected any limitations caused by his

obesity because of the fact that he "worked while obese for a number of years" and asserts, "this

vague assessment cannot constitute substantial evidence and is at odds with the medical evidence

in this case."  Doc. 14, p. 12.

The ALJ remarked that the records show that, prior to, during, and after the relevant

period, Sponsler was obese and consistently had a BMI above 40.  Tr. 25.  She remarked that,

despite his obesity, Sponsler worked for many years and that physical exam findings "showed no

evidence of any specific or quantifiable impact on [his] pulmonary, musculoskeletal, endocrine,

or cardiac functioning due to his weight."  Tr. 26.  She commented that Sponsler had stated that

he walked 30 minutes, 2-3 times a week, indicating that his "weight had no impact on his ability to ambulate or other body system." Tr. 26. Despite his obesity, his hypertension and hypothyroidism "remained controlled/stable" and exam findings showed a normal gait, clear lungs, a regular heart rhythm and rate, and no neurological or gastrointestinal abnormalities. Tr. 26. Dr. Keyes had found that he could stand and ambulate without difficulty and he had full muscle strength and normal range of motion despite his 40+ BMI. Tr. 26-27. The ALJ concluded, "When considering that [the claimant stopped working for issues unrelated to his impairments] with the claimant's longstanding history of diabetes, right knee problems and obesity for which there is no evidence of a significant deterioration at the time of his alleged onset date, [it] suggests those conditions would not have prevented work had the claimant not have been fired." Tr. 27-28. She also mentioned that Sponsler continued to perform odd jobs involving some of that kind of work after his alleged onset date. Tr. 28.

Sponsler's objection to the ALJ's discussion of his obesity lacks merit. First, the ALJ's reliance on the fact that Sponsler used to work a physically demanding job while obese is not "vague," as he suggests (Doc. 14, p. 12); it is accurate and on point. Second, the ALJ did not rely on this fact alone in her discussion about Sponsler's obesity, as explained above. Third, the ALJ's alleged failure to discuss the severity of his obesity diagnosis (Doc. 14, p. 12) does not describe an error by the ALJ; rather, it describes a deficiency in the evidence of record detailing how and to what extent Sponsler's obesity affected his functioning. To wit: there is little to no evidence that Sponsler's obesity affected his functioning. This is not the ALJ's fault. Finally, Sponsler's recitation of the risks of obesity (Doc. 14, p. 12) is not evidence showing Sponsler's obesity affected his functioning.

Sponsler identifies a treatment note from his podiatrist, Dr. King, who stated that Sponsler needed to get serious about weight loss and that his obesity was affecting his feet adversely. Doc. 14, p. 12 (citing Tr. 239). The treatment note, dated eight months after Sponsler's date last insured, also advised that Sponsler's feet are not "bad enough for disability" and that his metatarsus adductus was progressing "as expected." Tr. 239. He had a normal gait, diminished sensation in his lower extremities but normal capillary refill, normal range of motion, normal strength and no swelling, as the ALJ observed. Tr. 26, 239. In May and November 2014 he reported "doing great." Tr. 26, 289, 290. Dr. King's treatment notes do no show that the ALJ's decision lacked substantial evidence.

Sponsler's statement that the ALJ "committed harmful legal error in only discussing Plaintiff's obesity in passing" is inaccurate; the ALJ discussed in detail Sponsler's obesity. Lastly, citing to no specific record evidence, Sponsler asserts, "The medical record clearly shows that Plaintiff's obesity had more than a minimal impact on his ability to work." Doc. 14, p. 12. The ALJ disagreed, and substantial evidence supports her decision. Her decision, therefore, must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

### B. The ALJ did not err when she gave "little" weight to the state agency reviewing physicians' opinions

Sponsler argues that the ALJ erred when she gave "little" weight to the state agency reviewing physicians' opinions. Doc. 14, p. 8; Doc. 16, p. 3. The ALJ gave "little" weight to the state agency reviewing physicians' opinions (both of which found that Sponsler's diabetes, obesity, and joint dysfunction were severe impairments and that he could perform medium work with postural limitations) because Sponsler's "treatment records revealed no evidence of any

impact on the claimant's pulmonary, musculoskeletal, endocrine, or cardiac functioning during the relevant period." Tr. 27. The ALJ also remarked that Sponsler's statements did not support the state agency reviewing physicians' opinions because he had stated that he walked 30 minutes 2-3 times a week and had complained of relatively few functional problems to his endocrinologist. Tr. 27. This is substantial evidence supporting the ALJ's decision.

Sponsler argues that the ALJ incorrectly applied the Step Two standard when she found "no evidence of any impact" on his functioning during the relevant period when discussing the state agency reviewing physicians' opinions whereas the correct standard is whether a claimant's impairments have "more than a minimal effect" on his ability to do basic work activities. Doc. 16, p. 3 (citing SSR 96-3p). But "a determination whether an impairment(s) is severe [at Step Two] requires an assessment of the functionally limiting effects of an impairment(s)," and, therefore, "symptom-related limitations and restrictions must be considered at this step of the sequential evaluation process." SSR 96-3p. 1996 WL 374181, at *2. Thus, the ALJ's statement that there was no evidence of any impact on Sponsler's functioning sits squarely within the Step Two analysis. *See id.* Moreover, the ALJ's statement cited above was describing the weight she gave to the state agency reviewing physicians' opinions; the supportability and consistency of the opinion with the record as a whole are items properly considered by the ALJ when assigning weight to opinion evidence. *See* 20 C.F.R. § 404.1527(c) (an ALJ evaluates a non-treating source opinion by considering the supportability and consistency of the opinion, the specialization of the medical source, and any other factors raised by the claimant or others).

The ALJ did not apply the wrong standard when she assigned weight to the state agency reviewing physicians' opinions or in her Step Two analysis and her decision is supported by substantial evidence. Her decision, therefore, is affirmed. *See Jones*, 336 F.3d at 477.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED.

Dated: March 6, 2018

Kathleen B. Burke
United States Magistrate Judge